**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

|  |  |  |
|---|---|---|
| ESTATE OF BERNICE GOLDBERG, | : | |
| by the EXECUTOR GARY GOLDBERG, | : | |
| | : | CIVIL ACTION |
| Plaintiff, | : | |
| | : | |
| v. | : | NO.    14-980 |
| | : | |
| PHILIP NIMOITYN, M.D., KENNETH | : | |
| ROSENBERG, M.D., JAY SELLERS, | : | |
| M.D., CARDIOVASCULAR | : | |
| ASSOCIATES, THOMAS JEFFERSON | : | |
| UNIVERSITY HOSPITAL, (John, Jane, | : | |
| Corporate, LLC, Associations, P.C., Does, | : | |
| | : | |
| Defendants. | : | |

**MEMORANDUM**

BUCKWALTER, S.J.                                               December 8, 2014

Currently pending before the Court is the Motion to Dismiss Pursuant to Federal Rule of

Civil Procedure 12(b)(6) and Motion to Strike Pursuant to Federal Rule of Civil Procedure 12(f)

by Defendants Philip Nimoityn, M.D., Kenneth Rosenberg, M.D., Jay Sellers, M.D., Mitul

Kanzaria, M.D., Michael Baram, M.D., Cardiovascular Medical Associates, and Thomas

Jefferson University (collectively "Defendants").  For the following reasons, the Motions are

granted in part and denied in part.

**I.      FACTUAL BACKGROUND**

According to the facts set forth in the Second Amended Complaint, decedent Bernice

Goldberg (the "Decedent") was born on July 31, 1930 and was a resident of New Jersey, residing

at 59 B Edinburg Lane, Manchester, New Jersey.  (Second Am. Compl. ¶¶ 1, 38.)  Defendant

Philip Nimoityn, M.D. and Defendant Kenneth Rosenberg are physicians licensed to practice medicine in the State of Pennsylvania, and are part of a group practice known as Cardiovascular Medical Associates located at 818 Chestnut Street, Philadelphia, Pennsylvania.  (Id. ¶ 3.) Defendant Jay Sellers, M.D. is also a physician licensed to practice medicine in the State of Pennsylvania.  (Id. ¶ 14.)

From August 12, 2011 through August 24, 2011, Defendants provided medical services to the Decedent during a hospitalization at Thomas Jefferson University Hospital (the "Hospital").  (Id. ¶ 5.)  During this admission, Dr. Nimoityn was the attending physician responsible for the care, treatment, and nutritional status of the Decedent, and was purportedly acting as the agent/employee of Thomas Jefferson University.  (Id. ¶¶ 6–7.)  The Decedent was allegedly unable to make decisions regarding her treatment, and her son, Plaintiff Gary Goldberg, had power of attorney to make her medical decisions.  (Id. ¶ 8.)  On August 16, 2011 at 7:58 p.m., Goldberg consented to the placement of a Percutaneous Endoscopic Gastronomy ("PEG") tube in his mother for the purpose of providing nutrition.  (Id. ¶ 9.)  Plaintiff asserts that Defendants had a duty to ensure treatment was instituted specifically regarding the placement of a PEG tube.  (Id. ¶ 10.)  The PEG was never placed and the lack of nutrition exacerbated her condition and ultimately led to her demise on August 24, 2011.  (Id. ¶ 10.)

### A.    Facts According to the Medical Records Provided by Plaintiff

During a prior admission in May 2011, the Decedent was evaluated by a psychiatrist for competency regarding the ability to make medical decisions, and was found not to be competent. (Id. ¶ 16.)  Decedent went to the emergency room on August 11, 2011 at Thomas Jefferson Hospital and was admitted on August 12, 2011.  (Id. ¶ 17.)  The nursing transfer summary documented the family's insistence that their mother be given a puree diet because attempts at

passing an NG tube during the past week were not successful.  (Id. ¶ 17.)  The patient history and physical confirmed that the Decedent was a "very poor historian" and was "poorly cooperative." (Id. ¶ 18.)

On August 12, 2011, a progress note timed at 10:00 indicated that the Decedent was adamant about not getting a PEG tube and stated that she could eat, but was not eating because she was "rebelling against the world."  (Id. ¶ 19.)  She believed her son did not have control over her and could "just wait until she's dead."  (Id.)  Dr. Mitul Kanzaria spent a considerable amount of time discussing her need for a PEG tube to make her stronger.  (Id. ¶ 19.)  On August 15, 2011 at 11:00, a Gastroenterology note indicated that the healthcare providers were discussing a feeding tube versus a PEG tube.  (Id. ¶ 20.)  A note dated August 16, 2011 at 5:00 stated that an NG tube had been placed, but the Decedent was found with the tube coiled in her mouth, so it was pulled and removed.  (Id. ¶ 21.)  A nurse then tried to feed her dinner and she ate a couple of spoonfuls of applesauce, peaches, and vanilla ice cream.  (Id.)  One hour later, an NG tube was again passed and removed because the Decedent was uncooperative and would not drink water. (Id. ¶ 22.)  A note dated August 16, 2011 at 6:30 indicated possible PEG tube placement and that they would again attempt an NG tube first.  (Id. ¶ 23.)  That same day, at 11:45 a.m., the notes showed that NG tube placement was unsuccessful and that the providers needed to discuss possible endoscopic PEG placement with the Decedent's son/power of attorney.  (Id. ¶ 24.)

Plaintiff Goldberg was contacted and he gave his consent for a PEG tube at approximately 3:15 p.m. on August 16, 2011.  (Id. ¶ 25.)  A consent form was signed via phone on August 16, 2011 at 5:20 p.m. for anesthesia and PEG Tube Placement.  (Id. ¶¶ 26–27).  The following day, on August 17, 2011 at 5:00 a.m., the Decedent was given nothing by mouth ("NPO") for PEG placement.  (Id. ¶ 29.)  A subsequent note at 7:00 indicated that the Decedent

was "to go for Peg today." (Id. ¶ 31.) A psychiatric consultation was performed on August 17,

2011 at 11:05 and the Decedent was found to not have the capacity to make medical decisions.

(Id. ¶ 32.) On August 18, 2011 at 8:00, the Decedent refused the PEG tube and notes revealed

that a psychiatric consultation was completed and they were awaiting a report on competency.

(Id. ¶ 33.) A progress note of August 19, 2011 at 2:15 a.m. reflected the first documentation of a

decrease in the Decedent's oxygen saturation levels. (Id. ¶ 34.)

### B.     Facts According to Plaintiff's Personal Knowledge

According to Plaintiff's personal observations, the Decedent had been declared

incompetent by psychiatrists at Thomas Jefferson Hospital during a May 2011 admission, and he

had power of attorney over his mother's treatment. (Id. ¶ 39.) He became concerned over the

course of her treatment at Jefferson. When the Hospital convened an Ethics Meeting, the Ethics

Committee recognized that the Decedent was incompetent to make medical decisions, and that

Goldberg had power of attorney to make medical decisions for her. (Id.)

The Decedent was admitted to the Hospital on August 11, 2011. (Id.) Goldberg

continued to be concerned over the quality of care and tried repeatedly, but unsuccessfully, to get

Dr. Nimoityn on the phone. (Id. ¶ 41.) Allegedly, while Goldberg was in the Hospital

Administrator's office, Dr. Nimoityn called and told Goldberg that he "had just gotten off the

telephone with the hospital's attorney, that [Goldberg] had butted heads with a lot of people, and

that if [Goldberg] didn't stop complaining, that the hospital would not want to treat [Goldberg's]

mother anymore." (Id.)

Day after day, Goldberg was purportedly given a different story about why a PEG tube

was not placed in the Decedent. On August 17, 2011, Goldberg received a call early in the

morning that the Decedent was scheduled for a PEG tube. (Id. ¶ 42.) When he arrived at the

Hospital in the afternoon, however, he was told that the PEG tube was not placed.  (Id. ¶ 42.)

After demanding to see Dr. Nimoityn, Plaintiff was met by Dr. Nimoityn's resident, Dr.

Kanzaria, who told him that he "could not advocate for a PEG tube."  (Id.)  Plaintiff demanded

the PEG tube under his power of attorney.  (Id.)  According to Plaintiff, there was a note in big

letters on the board in the Decedent's room, which boldly stated that the Decedent should not be

given food or water.  (Id.)

On August 19, 2011, the Decedent began to have difficulty breathing and Dr. Jay Sellers

came to her room and determined that she should be transferred to the Intensive Care Unit

("ICU").  (Id. ¶ 43.)  When the Decedent first arrived in ICU, Goldberg was advised by Dr. Vaid

that, on Monday, she would receive a PIC line so that she could be nourished.  (Id. ¶ 44.)  Dr.

Sellers also agreed that "nutrition is key" and that albumin levels showed that she was

malnourished.  (Id.)  The following Monday, Plaintiff discussed his mother's care and treatment

with Dr. Baram, Dr. Nimoityn, and Dr. Sellers and demanded that she be fed and hydrated.  (Id. ¶

45.)  He told them that he wanted everything done for her, even including dialysis to help her

kidney function, but they "steadfastly refused to feed or hydrate her."  (Id. ¶ 45.)

Plaintiff went to the Hospital Administrator's office and spoke with Dr. Merli's secretary,

who sent him to patient services.  (Id. ¶ 46.)  On August 22, 2011, Plaintiff went to Susan Emory,

the Nutrition Specialist in ICU.  (Id. ¶ 47.)  At first, she was concerned that Decedent was not

being fed or hydrated and said she would look into the matter immediately.  (Id.)  Later that day,

she said she looked into the matter and spoke with the doctors, but her "hands were tied."  (Id.)

On August 23, 2011, Dr. Rosenberg came into the Decedent's room and examined her for

a few moments while the Decedent was still conscious.  (Id. ¶ 48.)  He then announced that

"She's worse today than yesterday . . . she's done."  (Id.)  Dr. Rosenberg stated that "she did not

want a PEG tube, she did not want anything." (Id.)  Plaintiff then demanded that Dr. Rosenberg leave the room and said that his actions would be referred to a prosecutor.  (Id.)

Throughout this admission, Plaintiff and his sister, Donna Applegate, witnessed their mother begging and pleading for food and water.  (Id. ¶ 49.)  When she was in the ICU, the family was unable to feed or hydrate her because she constantly wore a mask.  (Id.)  During the day, Plaintiff was advised that a second emergency ethics meeting was scheduled for 9:00 a.m. on August 24, 2011.  (Id.)  Not having been nourished, the Decedent began to slip.  (Id. ¶ 50.)  On the evening of August 23, 2011, Plaintiff was advised by the shift nurse that the Decedent "had nothing hanging by her bed," that "she has no food, no water, no medication."  (Id.)  The nurse went to talk to the doctor on duty to see why she had no nourishment or hydration.  (Id. ¶ 50.)

Plaintiff then went to the desk and asked to see the physician in charge.  (Id. ¶ 51.)  He was told to go back to the room, and that the doctor would meet him there.  (Id.)  Dr. Sellers came to the outside of the room and Plaintiff demanded that his mother be given nourishment.  (Id.)  Dr. Sellers said, "the team has decided that your mother is going to die anyway so we are not going to feed or hydrate her."  (Id.)  When Plaintiff vigorously protested, Dr. Sellers repeated the team's sentiments.  (Id.)  Plaintiff then asked to see Dr. Sellers's shift supervisor, who was Dr. Peters.  (Id. ¶ 52.)  Dr. Peters took Plaintiff and his two sisters into the ICU visitor's lounge where Plaintiff insisted that the family wanted their mother fed and hydrated.  (Id.)  Plaintiff told Dr. Peters what Dr. Sellers said and Dr. Peters remarked that "Dr. Sellers was wrong" and that the matter would be discussed with Dr. Nimoityn.  (Id. ¶ 52.)

At 5:11 a.m., on August 24, 2011, the Decedent passed away.  (Id. ¶ 53.)  The day after sitting shiva, Plaintiff went to the Philadelphia District Attorney to report that a murder had been

committed at Jefferson.  (Id. ¶ 54.)  The same day, Plaintiff went to the United States Department of Justice and filed a Complaint.  (Id.)

    **C.**    <u>**Procedural History**</u>

Plaintiff initiated a lawsuit in the United States District Court for the District of New Jersey and, thereafter, filed an almost identical action in the Superior Court of New Jersey in Ocean County.  Defendants filed motions to dismiss in both actions.  The state court dismissed its action in the entirety, while the federal court, upon agreement of the parties, ordered that the case be transferred to the United States District Court for the Eastern District of Pennsylvania. This Court received the original record of the case on February 10, 2014.  The Amended Complaint asserted that Defendants Nimoityn and Sellers were negligent in their care of the Decedent and that both of their actions were so grossly negligent and/or intentional that they merit an award of punitive damages.  (Am. Compl. ¶¶ 15 & Count I Wherefore Clause.) Additionally, the Amended Complaint asserted that "[t]he defendants were acting within the scope of there [sic] employment and agency with Thomas Jefferson University Hospital."  (Am. Compl. Count II, ¶ 2.)  Finally, although not set forth as a specific cause of action, the Amended Complaint asserted that Dr. Sellers was "motivated by religious discrimination which violates the United States Constitution."  (Id. ¶ 15.)

Following Defendants' Motion to Dismiss, the Court issued a Memorandum and Order, dated July 29, 2014, allowing the negligence claim against Dr. Nimoityn to proceed, but dismissing, without prejudice: (a) the punitive damages claims against Defendant Nimoityn; (b) all claims against Defendant Sellers; and (c) all claims against Defendant Thomas Jefferson University.  The Court then gave Plaintiff twenty days in which to file a Second Amended Complaint "correcting any of the pleading deficiencies identified in the Court's accompanying

Memorandum Opinion." Estate of Goldberg v. Nimoityn, No. Civ.A.14-980, 2014 WL 3732206, at *17 (E.D. Pa. July 29, 2014).

Plaintiff filed his Second Amended Complaint on August 13, 2014, naming the same defendants and adding multiple new defendants, including Kenneth Rosenberg, M.D., Mitul Kanzaria, M.D., Michael Baram, M.D., and Cardiovascular Medical Associates. On September 19, 2014, Defendants filed the current Motion to Dismiss. Plaintiff did not file a formal response, but, on October 3, 2014, filed a letter responding to the Motion.[1] On October 17, 2014, Defendants filed a Reply Brief, making this Motion ripe for judicial consideration.

## II.    STANDARD OF REVIEW

Under Rule 12(b)(6), a defendant bears the burden of demonstrating that the plaintiff has not stated a claim upon which relief can be granted. Fed. R. Civ. P.12(b)(6); see also Hedges v. United States, 404 F.3d 744, 750 (3d Cir. 2005). In Bell Atlantic Corporation v. Twombly, 550 U.S. 544 (2007), the United States Supreme Court recognized that "a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." Id. at 555. Following these basic dictates, the Supreme Court, in Ashcroft v. Iqbal, 556 U.S. 662 (2009), subsequently defined a two-pronged approach to a court's review of a motion to dismiss. "First, the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Id. at 678. Thus, although "Rule 8

---

[1]  The Court cautions Plaintiff that letters are not acceptable forms of responses to properly-filed Motions. For the purposes of this Motion only, the Court will accept Plaintiff's letter as a substantive brief in response. Should Plaintiff unilaterally choose to file a letter in response to any future motions, however, the Court will deem such motions uncontested.

marks a notable and generous departure from the hyper-technical, code-pleading regime of a prior era . . . it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions." Id. at 678–79.

Second, the Supreme Court emphasized that "only a complaint that states a plausible claim for relief survives a motion to dismiss." Id. at 679. "Determining whether a complaint states a plausible claim for relief will, as the Court of Appeals observed, be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." Id. A complaint does not show an entitlement to relief when the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct. Id.; see also Phillips v. Cnty. of Allegheny, 515 F.3d 224, 232–34 (3d Cir. 2008) (holding that: (1) factual allegations of complaint must provide notice to defendant; (2) complaint must allege facts suggestive of the proscribed conduct; and (3) the complaint's "'factual allegations must be enough to raise a right to relief above the speculative level.'" (quoting Twombly, 550 U.S. at 555)).

Notwithstanding these new dictates, the basic tenets of the Rule 12(b)(6) standard of review have remained static. Spence v. Brownsville Area Sch. Dist., No. Civ.A.08-626, 2008 WL 2779079, at *2 (W.D. Pa. July 15, 2008). The general rules of pleading still require only a short and plain statement of the claim showing that the pleader is entitled to relief and need not contain detailed factual allegations. Phillips, 515 F.3d at 233. Further, the court must "accept all factual allegations in the complaint as true and view them in the light most favorable to the plaintiff." Buck v. Hampton Twp. Sch. Dist., 452 F.3d 256, 260 (3d Cir. 2006). Finally, the court must "determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief." Pinkerton v. Roche Holdings Ltd., 292 F.3d 361, 374 n.7 (3d Cir. 2002).

III.    **DISCUSSION**

Defendants now move to dismiss multiple portions of the Second Amended Complaint on the bases that: (1) any claims against newly-named defendants or new claims against existing defendants are barred by the statute of limitations; and (2) the punitive damages claims must be dismissed.  In addition, Defendants move to strike immaterial, impertinent, prejudicial, and scandalous allegations from the Second Amended Complaint.

A.    **Statute of Limitations**

Defendants first assert that any attempt to add new defendants and new claims in the Second Amended Complaint is time barred under the pertinent statute of limitations.  Federal courts sitting in diversity treat statutes of limitations as substantive, and therefore are bound by the applicable state law.  Jaworowski v. Ciasulli, 490 F.3d 331, 333 (3d Cir. 2007).  In this case, Pennsylvania law supplies the substantive law.  As such, Plaintiff's tort claims for professional negligence are governed by a two-year statute of limitations.  See 42 Pa. Cons. Stat. § 5524 (2014).  Under Pennsylvania law, as a general rule, "the statute of limitations begins to run as soon as the right to institute and maintain a suit arises."  Fine v. Checcio, 870 A.2d 850, 857 (Pa. 2005) (citing Pocono Int'l Raceway, Inc. v. Pocono Produce, Inc., 468 A.2d 468, 471 (Pa. 1983)).  Professional negligence claims begin to accrue upon the occurrence of the breach of a duty.  Wachovia Bank, N.A. v. Ferretti, 935 A.2d 565, 574 (Pa. Super. Ct. 2007).

Defendants now assert that any claims against Drs. Rosenberg, Kanzaria, and Baram, as well as Cardiovascular Medical Associates, must be dismissed because these parties were not named as defendants in either of the previous iterations of the Complaint.  Accordingly, any attempt to name them in the Second Amended Complaint—filed after the statute of limitations expired—is time-barred.  In addition, Defendants contend that the new claim of direct liability

for corporate negligence against the Hospital was not included in either the original or Amended Complaints and is likewise outside the statute of limitations. The Court addresses each argument separately.

### 1.    Newly-Named Defendants

In the present case, the Decedent, Bernice Goldberg, died on August 24, 2011, making this the latest possible date of Defendants' alleged breach of duty. Under 42 Pa.C.S § 5524, the statute of limitations expired on August 24, 2013. While both Plaintiff's original Complaint and Amended Complaint were filed prior to August 24, 2013, those documents named only Dr. Nimoityn, Dr. Sellers, Thomas Jefferson University Hospital, and multiple John Does as Defendants. In the Second Amended Complaint, however, Plaintiff included, for the first time, Drs. Rosenberg, Kanzaria, and Baram, and Cardiovascular Medical Associates as defendants. The Second Amended Complaint was not filed until August 13, 2014, almost one year after the expiration of the statute of limitations, thereby making the claims against these newly-named defendants untimely.

In response, Plaintiff argues that the claims against the new defendants should be deemed to relate back to the date of the original Complaint. Where the statute of limitations has expired, a plaintiff may only add a new claim or name a new party if the plaintiff demonstrates that the new claim or party relates back to the filing date of the original complaint. Estate of Grier v. Univ. of Pa. Health Syst., No. Civ.A.07–4224, 2009 WL 1652168, at *2–3 (E.D. Pa. June 11, 2009). "If the amendment relates back to the date of the filing of the original complaint, the amended complaint is treated, for statute of limitations purposes, as if it had been filed at that time." Garvin v. City of Phila., 354 F.3d 215, 220 (3d Cir. 2003) (citing Singletary v. Pa. Dep't of Corr., 266 F.3d 186, 189 (3d Cir. 2001)).

When a party seeks to add or substitute a party—including replacing a "John Doe"

defendant with a named party—Federal Rule of Civil Procedure 15(c)(1)(C) controls whether the

new claims relate back.  This Rule provides as follows:

> (1) When an Amendment Relates Back.  An amendment to a pleading relates back
> to the date of the original pleading when:
>
> . . .
>
> > (C) the amendment changes the party or the naming of the party against
> > whom a claim is asserted, if Rule 15(c)(1)(B) is satisfied and if, within the
> > period provided by Rule 4(m) for serving the summons and complaint, the
> > party to be brought in by amendment:
> >
> > > (i) received such notice of the action that it will not be prejudiced in
> > > defending on the merits; and
> > >
> > > (ii) knew or should have known that the action would have been
> > > brought against it, but for a mistake concerning the proper party's
> > > identity.

Fed. R. Civ. P. 15(c)(1)(C).  In other words, to add or substitute a new party, including replacing

a "John Doe" defendant with a named defendant, a plaintiff must:

> [1] establish that the amended pleading relates to the same conduct or transaction or
> occurrence set forth in the original complaint; [2] that within the 120–day time period
> prescribed by Rule 4(m), the proposed new defendant had notice of the action; and
> [3] that the proposed new defendant knew or should have known that but for a
> mistake of identity, he or she would have been named in the initial complaint.

Estate of Grier, 2009 WL 1652168, at *3.  The plaintiff seeking leave to amend a pleading has

the burden of demonstrating that each element has been satisfied.  Muhammed v. Pawlowski, No.

Civ.A.11–5004, 2012 WL 748411, at *2 n.3 (E.D. Pa. Mar. 7, 2012).

With regard to the third element of this test, the Supreme Court has held that the starting

inquiry focuses on whether the newly-added party knew or should have known that, absent some

mistake, the lawsuit would have been brought against him or her.  <u>Krupski v. Costa Crociere</u> <u>S.p.A.</u>, 560 U.S. 538, 541 (2010) ("We hold that relation back under Rule 15(c)(1)(C) depends on what the party to be added knew or should have known, not on the amending party's knowledge or its timeliness in seeking to amend the pleading.").  "Information in the plaintiff's possession is relevant, [however,] . . . if it bears on the defendant's understanding of whether the plaintiff made a mistake regarding the proper party's identity" as opposed to a fully informed decision to sue one party instead of another "while fully understanding the factual and legal differences between the two parties." <u>Id.</u> at 548.  In other words, "when the original complaint and the plaintiff's conduct compel the conclusion that the failure to name the prospective defendant in the original complaint was the result of a fully informed decision as opposed to a mistake concerning the proper defendant's identity, the requirements of Rule 15(c)(1)(C)(ii) are not met." <u>Id.</u> at 552.  This holding comports with the Third Circuit's still-valid holding that "[a]n amended complaint will not relate back if the plaintiff had been aware of the identity of the newly named parties when she filed her original complaint and simply chose not to sue them at that time." <u>Garvin</u>, 354 F.3d at 221–22.

In support of his relation back argument, Plaintiff contends that "[s]urely defendant Nimoityn's private practice, Cardiovascular Medical Associates, and his partner Dr. Kenneth Rosenberg, as well as Thomas Jefferson University Hospital, had actual and constructive notice within 120 days after the filing and service of the complaint.  Furthermore, there is clearly no prejudice to these defendants . . . ."  (Pl.'s Letter Brief in Response 1.)  As to Drs. Baram and Kanzaria, Plaintiff contends that "they are still associated with Thomas Jefferson University Hospital and therefore had constructive and probably actual notice of this lawsuit within the 120 day time period.  In the alternative, the defense should prove that Dr. Baram nor Dr. Kanzaria

13

[sic] had either actual or constructive notice within the 120 day time period."  (Id.)

Such a cursory argument goes only to the second element of Rule 15(c)—that the proposed new defendant had notice of the action.[2]  It does nothing to address the third element and explain why the proposed new defendants were not named in the original or Amended Complaints.  Nor does it demonstrate that the new defendants knew or should have known that, but for a mistake of identity, they would have been named in the initial Complaint.  As demonstrated by Plaintiff's current and previous filings, Plaintiff was well aware of which doctors were in charge of the Decedent's care and which doctors made the objectionable decisions that allegedly led to the Decedent's death.  Indeed, the majority of the allegations in the various iterations of the Complaint are based on Plaintiff's first-hand knowledge and interaction with these doctors.  Certainly, Drs. Rosenberg, Baram, and Kanzaria were reasonable in believing that their omission from the previous complaints was as a result of Plaintiff's informed decision to not sue them, as opposed to a mistake.  Given Plaintiff's failure to prove entitlement to relation back, the Court declines so find.  In turn, the claims against these Defendants are barred pursuant to the applicable statute of limitations.

### 2.    New Claim Against Thomas Jefferson Hospital

With respect to Plaintiff's new claim of direct liability for corporate negligence against the Hospital, however, such a claim may relate back to the date of the original Complaint.  Federal Rule of Civil Procedure 15(c)(1)(B) states that, "[a]n amendment to a pleading relates back to the date of the original pleading when: . . . (B) the amendment asserts a claim or defense that arose out of the conduct, transaction, or occurrence set out—or attempted to be set out—in

---

[2]  Even as to the second element, Plaintiff's argument only speculates and does not set forth any factual allegations establishing that any of the new defendants had actual or constructive notice within 120 days of the filing of the original Complaint.

the original pleading." Fed. R. Civ. P. 15(c)(1)(B).  This Rule does not contain the additional

requirements set forth in subsection 15(c)(1)(C) for the addition of new defendants.

In the original and Amended Complaints, in this case, Plaintiff asserted only a theory of

vicarious liability against the Hospital.  The Court dismissed that claim because Plaintiff had

never named or served the Hospital, but nonetheless granted Plaintiff time in which to file a

Second Amended Complaint curing those procedural deficiencies and "pleading all desired

causes of action against all desired defendants." Estate of Goldberg, 2014 WL 3732206, at *7.

In doing so, the Court implicitly allowed the addition of the Hospital as a defendant to relate

back to the filing of the original Complaint since, under Rule 15(c)(1)(C), Plaintiff had

demonstrated that the Hospital had constructive notice of the suit and knew or should have

known that, absent some mistake, the lawsuit would have been brought against it.

Subsequently, in the Second Amended Complaint, Plaintiff re-asserted that the Hospital

was liable on a vicarious liability theory, but added additional claims that the Hospital was

directly negligent in hiring and granting privileges to the Defendant physicians and "conspired

with the defendant physicians to intentionally deprive the decedent water and food and a PEG

tube in reckless disregard for the wellbeing of the decedent for the intended purpose of causing

her early demise." (Second Am. Compl., Count II ¶¶ 3–4.)  For such a claim to relate back to the

date of the original filing, Rule 15(c)(1)(B) requires only that "the amendment assert[] a claim or

defense that arose out of the conduct, transaction, or occurrence set out—or attempted to be set

out—in the original pleading." Fed. R. Civ. P. 15(c).  Undisputedly, the claim of direct corporate

negligence against the Hospital arises out of the same conduct and occurrences described in the

original pleadings.  Contrary to Defendants' argument, Plaintiff need not justify why he did not

make this direct claim against the Hospital in prior pleadings or show that the Hospital should

15

have been aware of this claim.  Accordingly, the Court rejects this portion of the Motion to Dismiss.[3]

### B. <u>Punitive Damages Claim</u>

Defendants next seek to dismiss the punitive damages claim against them in the Second Amended Complaint.  In previously dismissing this claim, the Court found that the Amended Complaint had failed to adequately set forth allegations showing any entitlement to punitive damages.  Nonetheless, the Court permitted Plaintiff to amend his pleading to set forth more specific allegations.

Pennsylvania's Medical Care Availability and Reduction of Error Act provides that punitive damages may be awarded against a health care provider "for conduct that is the result of the health care provider's willful or wanton conduct or reckless indifference to the rights of others."  40 P.S. § 1303.505(a).  "Although in some contexts, the concept of recklessness includes the two somewhat different mental states of (1) conscious disregard for a known risk of harm, and (2) unreasonable failure to appreciate the high risk of harm, for the purposes of establishing a request for punitive damages, only the first concept of recklessness is sufficient." <u>Stroud v. Abington Mem. Hosp.</u>, 546 F. Supp. 2d 238, 257 (E.D. Pa. 2008) (citing <u>Hutchison ex. rel. Hutchison v. Luddy</u>, 582 Pa. 114, 870 A.2d 766, 771–72 (2005)).  To that end, the Pennsylvania Supreme Court has established that:

---

[3]  The Court takes note of Plaintiff's prior representation to this Court—in response to a previous Motion to Dismiss—that he was not claiming any direct theory of liability against the Hospital.  While the Court allowed Plaintiff to amend his Complaint, that leave to amend was generally to allow Plaintiff to properly name and serve the Hospital, not to allow Plaintiff to raise a new theory of liability about which he clearly knew.  Nonetheless, given Rule 15(c)(1)(B)'s liberal amendment policy with respect to new claims that arise out of the same transaction or occurrences set forth in the initial pleadings, the Court is allowing this new theory of liability to proceed.  Similar litigation maneuvers will be looked at more skeptically in the future.

> [I]n Pennsylvania, a punitive damages claim must be supported by evidence sufficient to establish that (1) a defendant had a subjective appreciation of the risk of harm to which the plaintiff was exposed and that (2) he acted, or failed to act, as the case may be, in conscious disregard of that risk.

Hutchison, 870 A.2d at 771–72 (citation omitted).  Mere negligence or even gross negligence is thus insufficient to support a punitive damages award.  See 40 P.S. § 1303.505(b).  However, "[t]he fact that a cause of action bottomed on negligence does not require proof of the heightened showing of culpability necessary to sustain punitive damages in order to secure the underlying compensatory damages does not mean that punitive damages—as an element of damages—should be deemed automatically unavailable, even if the conduct of the defendant(s) went well beyond negligence and into the realm of the outrageous." Hutchison, 870 A.2d at 772. "[P]rovided the plaintiff demonstrates that the defendant acted with at least a mental state of recklessness (conscious disregard), punitive damages may be recovered on a claim sounding in negligence." Stroud, 546 F. Supp. 2d at 257.

Under Federal Rule of Civil Procedure 12(b)(6), Plaintiff has pled a claim for punitive damages sufficient to survive a motion to dismiss.  Plaintiff's Second Amended Complaint pleads with some detail the factual basis for his negligence claim.  He specifically alleges that the Decedent was admitted into Jefferson Hospital by Dr. Nimoityn (Second Am. Compl. ¶ 38), and that Dr. Sellers had determined that the Decedent should be transferred to the ICU.  (Id. ¶ 43.) Plaintiff also asserts that Dr. Sellers agreed that "nutrition [was] key" in the treatment of decedent given that her bloodwork showed that she was malnourished.  (Id. ¶ 44.)  Plaintiff further contends that he discussed his mother's treatment with both Dr. Nimoityn and Dr. Sellers and demanded that she be fed and hydrated.  (Id. ¶ 45)  All of these allegations establish that the Defendants had a subjective appreciation of the risk of harm to which the Decedent was exposed.

Further, Plaintiff sets forth the following specific allegations to show that the Defendants acted, or failed to act, in conscious disregard of that risk:

- While [Plaintiff was] still in the Hospital Administrator's office, Dr. Nimointyn [sic] called. He was not happy. Dr. Nimointyn [sic] told me that he had just gotten off the telephone with the hospital's attorney, that I had butted heads with a lot of people, and that if I didn't stop complaining, that the hospital would not want to treat my mother anymore. (Second Am. Compl. ¶ 41.)

- On Monday, Dr. Vaid was no longer assigned to the case. Mr. Goldberg discussed care and treatment with Dr. Baram, Dr. Nimoityn and Dr. Sellers and demanded that she be fed and hydrated. He told them that he wanted everything done for her, even including dialysis to help her kidney function. They steadfastly refused to feed or hydrate her. He told them that while my mother was just an 80 year old woman to them, she was his mother, and demanded that she be fed and hydrated. (Second Am. Compl. ¶ 45.)

- Mr. Goldberg then went to the desk and asked to see the physician in charge. He was told to go back to the room, and that the doctor would meet him there. Dr. Jay Sellers came to the outside of the room. At that time, he demanded that his mother be given nourishment and hydrated. Dr. Sellers, [sic] said "The team has decided that our mother is going to die anyway so we are not going to feed or hydrate her." Mr. Goldberg responded that he did not have that authority, and that he had decision making authority over his mother's care, and demanded that she be fed and hydrated. Dr. Sellers again repeated that, "The team has decided that your mother is going to die anyway, so we are not going to feed or hydrate her." (Second Am. Compl. ¶ 51.)

Taking all of these various allegations as true—as the Court must on review of a Motion to Dismiss—Plaintiff has pled a plausible claim for punitive damages. According to Plaintiff's specific factual allegations, Defendants had a subjective appreciation of the risk that the Decedent faced in the absence of proper nourishment, yet consciously failed to provide her with a feeding tube under the rationale that she was going to die anyway. If such allegations prove to be true, then Plaintiff would be entitled to punitive damages against Defendants. Accordingly, the Court declines to dismiss this claim.

C.     **Motion to Strike**

The final portion of Defendants' Motion seeks to strike multiple allegations from the

Second Amended Complaint which Defendants characterize as "immaterial, impertinent, and/or

serve no function except to slander, harass and prejudice moving defendants in the defense of

this matter."  (Defs.' Mem. Supp. Mot. to Dismiss 12.)  Specifically, Defendants ask the Court to

strike all allegations of and references to "murder," "intentional" killing, "conspiracy,"

"euthanasia," "torture," "crimes against humanity," Defendants being "annoyed" with decedent,

Defendants being motivated by cost of care and an "evil intent" to end the life of the Decedent,

and other "malicious" conduct of Defendants that have no basis remaining in the Second

Amended Complaint.

Federal Rule of Civil Procedure 12(f) permits a court to "strike from a pleading an

insufficient defense or any redundant, immaterial, impertinent, or scandalous matter."  Fed. R.

Civ. P. 12(f).  "Impertinent" matter consists of statements that do not pertain, and are not

necessary, to the issues in question.  Cech v. Crescent Hills Coal Co., No. Civ.A.96-2185, 2002

WL 31002883, at *28 (W.D. Pa. July 15, 2002).  A "scandalous" matter or pleading is one that

casts a derogatory light on someone, uses repulsive language, or detracts from the dignity of the

court.  Carone v. Whalen, 121 F.R.D. 231, 233 (M.D. Pa. July 29, 1988).  Although a court has

considerable discretion with motions to strike, as a general rule they are not favored and "usually

will be denied unless the allegations have no possible relation to the controversy and may cause

prejudice to one of the parties, or if the allegations confuse the issues."  River Road Devel. Corp.

v. Carlson Corp., No. Civ.A.89–7037, 1990 WL 69085, at *3 (E.D. Pa. May 23, 1990) (citing 5

C. Wright & A. Miller, Federal Practice and Procedure § 1382, 809–10, 815 (1969)).  Thus,

striking a pleading or a portion of a pleading "is a drastic remedy to be resorted to only when

required for the purposes of justice." <u>DeLa Cruz v. Piccari Press</u>, 521 F. Supp. 2d 424, 428 (E.D. Pa. 2007) (quotations omitted).

Defendants' Motion requests that the Court strike paragraphs 15, 37, 39–42, 49–52, and 54–59 of the Second Amended Complaint. Many of these paragraphs, however, contain factual allegations of actual events or statements. For example, paragraph forty indicates that Plaintiff was told by the Hospital that his mother had been admitted too many times "and it was now time to come up with a plan so that she would not keep coming back." (Second Am. Compl. ¶ 40.) Paragraph fifty-one states in part that "Mr. Goldberg reminded Dr. Sellers that Dr. Kevorkian died in prison, and that he and his colleagues would be held accountable for their actions." (<u>Id.</u> ¶ 51.) Further, paragraph forty-nine describes Plaintiff and his sister's observations of their mother in the ICU when she was crying and begging for food and water. (<u>Id.</u> ¶ 49.) Finally, in paragraph fifty-two, Plaintiff asserts that he told Dr. Peters that euthanasia was illegal and she agreed and said that "Dr. Sellers [sic] and the team's decision was wrong." (<u>Id.</u> ¶ 52.) While these allegations are indeed shocking, they are purportedly actual statements made by either Defendants, Plaintiff, or other individuals involved in the relevant events—as opposed to mere ruminations or characterizations of the events by Plaintiff. Assuming that such statements were actually made during the course of events giving rise to this lawsuit, they are pertinent to Plaintiff's allegations of negligence and his accompanying claim for punitive damages.[4] Accordingly, the Court declines to strike them.

---

[4] Paragraph 15 contains no factual allegations, but rather states that "Defendants did intentional [sic] and maliciously withhold from the decedent food and water and stated to the beneficiaries that decedent would not be given any food or water because it was determined that she was going to die anyway. This conduct not only is a deviation from the standard of care and a proximate cause of death, it is egregious." (Second Am. Compl. ¶ 15.) Such an allegation, while not grounded in a factual event, is nothing more than a legal recitation of the standard for an award of punitive damages. The Court does not find that it need be stricken under Rule 12(f).

The Court notes, however, that the Second Amended Complaint is also rife with allegations that have no factual basis, appear to have no purpose other than to publicly disparage Defendants, and, if permitted to remain, will result in prejudice to Defendants.  These allegations are as follows:

- Jefferson Hospital and the defendants said that decedent had been there too many times and that they needed to come up with a plan.  Dr. Philip Nimointyn [sic], Dr. Jay Sellers, Dr. Baram and Dr. Rosenberg came up with a plan.  They intentional [sic] disregarded the power of attorney, and intentionally deprived the decedent of nourishment and hydration causing her death.  Mr. Goldberg felt so strongly that they killed my mother, that the day after sitting Shiva, I went to the Philadelphia District Attorney to report that a murder had been committed at Jefferson.  On the dame day, I went to the United States Department of Justice and filed a Complaint.[5]  (Second Am. Compl. ¶ 54.)

- Defendants violated their oath, to heal the sick.  Defendants intentionally killed the decedent.  They intentionally took away the family's right to make medical decisions for their mother.   The intentionally cut decedent's life short.  (Id. ¶ 55.)

- Even if decedent was going to die anyway when she was in ICU, she had the right to die more comfortably.   Defendants conspired to intentionally withhold food and water, and tortured decedent the family [sic].  Defendants committed a crime against humanity and for that, they should be punished.  Dr. Sellers had a duty, even if the team had decided that decedent was not to be fed or hydrated, to go to the hospital administrator and report what the team had decided.  Instead, Dr. Sellers acquiesced, and went along with the killing of decedent.  (Id. ¶ 57.)

- Decedent was a difficult patient and was costing the hospital money as the hospital could have received more for the bed with another patient.  I was a persistent advocate for her, watching and questioning, and demanding.  In the end, Defendants wanted to show Mr. Goldberg who was in control, notwithstanding his power of attorney to make medical decisions. Defendants refused to follow my instructions to give my mother food and

---

[5]  Notably, Plaintiff agrees that the allegation concerning his report to the Philadelphia District Attorney's office about a murder committed at Jefferson should be stricken from the Second Amended Complaint.

hydration, even though the objective tests showed that she was malnourished. (Id. ¶ 58.)

• Dr. Nimointyn [sic] and Dr. Sellers intentionally withheld food and hydration. If decedent was going to die anyway when she was in ICU, giving her food and water, would have made her death more comfortable and more humane. Defendants tortured decedent and the family, to show that they, and they alone, were in control. (Id. ¶ 59.)

Such allegations are clearly scandalous. As generally noted above, "[t]he word 'scandalous' generally refers to any allegation that unnecessarily reflects on the moral character of an individual or states anything in repulsive language that detracts from the dignity of the court." Collura v. City of Phila., No. Civ.A.12-4398, 2012 WL 6645532, at *7–8 (E.D. Pa. Dec. 21, 2012) (internal quotations omitted), aff'd ___ F. App'x ___, 2014 WL 5422183 (3d Cir. 2014); see also In re 2TheMart.com, Inc. Sec. Litig., 114 F. Supp. 2d 955, 965 (C.D. Cal. 2000) ("'Scandalous' includes allegations that cast a cruelly derogatory light on a party or other person."). Plaintiff, in this matter, refers to Defendants as murderers, as committing crimes against humanity, as intentionally torturing the Decedent and her family, as conspiring with one another, and as being motivated by a cruel intention to save money and display their power. Such allegations are not grounded in any clear factual basis and, therefore, are unnecessarily outrageous. These derogatory attacks do nothing to illuminate the real issues before the Court—which are whether Defendants were negligent in their care of the Decedent and whether their actions were in conscious disregard of a known risk to the decedent. To the contrary, the language serves only to improperly disparage Defendants and to detract from the dignity of the Court. Therefore, such language should be stricken from Plaintiff's Second Amended Complaint.

**IV.     CONCLUSION**

In light of the foregoing, the Court will grant Defendants' Motion in part and deny it in part.  As to all claims asserted against new Defendants Drs. Rosenberg, Kanzaria, and Baram, and Cardiovascular Medical Associates, Defendants' Motion is granted and those Defendants are dismissed from the case.  As to the new claim for direct liability against Defendant Thomas Jefferson University, the Motion is denied and that claim shall be allowed to proceed.  Similarly, with respect to Plaintiff's claim for punitive damages against the remaining Defendants, the Court finds that Plaintiff has set forth sufficient allegations to survive the Motion to Dismiss. Finally, the Court shall grant Defendants' Motion to Strike in part and shall strike from the Second Amended Complaint paragraphs 54, 55, 57, 58, and 59.

An appropriate Order follows.