**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **ESTATE OF BERNICE GOLDBERG,** | : | |
| **by the Executor GARY GOLDBERG,** | : | |
| **Plaintiff,** | : | **CIVIL ACTION** |
| | : | |
| **v.** | : | **No. 14-980** |
| | : | |
| **PHILIP NIMOITYN, M.D., et al.,** | : | |
| **Defendants.** | : | |

**MCHUGH, J.**                                                                 **JUNE 17, 2016**

<u>**MEMORANDUM**</u>

      This is a medical negligence action governed by Pennsylvania law brought under the Court's diversity jurisdiction.  The crux of the action is an allegation that the individual Defendant, Philip Nimoityn, M.D., wrongfully refused to arrange for the implantation of a feeding tube as his patient, Bernice Goldberg, deteriorated, resulting in her premature death. There are also allegations of "corporate" negligence on the part of Defendant Thomas Jefferson University Hospital ("Jefferson"), both with respect to the hiring of the individual Defendant, and with respect to the practices of its residents.

      There is a global Motion for Summary Judgment advancing an argument that Plaintiff's expert is not competent to testify under Pennsylvania's MCARE Act because he presently lacks board certification in a case where the Defendant physician is board certified.  There is also a subsidiary Motion for Summary Judgment seeking dismissal of the corporate negligence claims against Jefferson, as well as Plaintiff's claim for punitive damages.

      Because the MCARE Act permits a physician who is not board certified but is otherwise qualified to opine on the standard of care, the global Motion for Summary Judgment will be

1

denied, but the direct claim against Jefferson and the claim for punitive damages will be dismissed.

## I.   Facts

Mrs. Goldberg was 81 years old when she arrived at the Jefferson Emergency Room on August 11, 2011, complaining of chest pain.  She suffered from several serious medical conditions including a history of COPD, diabetes, coronary artery disease, congestive heart failure, and suspected pancreatic cancer.  Doghramji Report, Def. Ex. E at 5.  She had been admitted to Jefferson several times in the months leading up to this admission, and her mental capacity was questioned and tested on several of those prior occasions.  Lamsback Report, Def. Ex. C at 3.

Mrs. Goldberg was admitted to the hospital and treated by Nimoityn on August 12.  That same day, a note indicates that a nutritionist recommended tube feedings "if indicated," but the decedent refused the placement of a PEG tube.[1]  Pl. Ex. Q.  On August 14, Nimoityn met with Gary Goldberg, the decedent's son, and Mr. Goldberg expressed that he was concerned about his mother's nutritional status and weight loss.  Nimoityn documented that he would consult with the gastrointestinal service regarding placement of a feeding tube.  Pl. Ex. M.  On August 15, a nasogastric tube was placed but could not be maintained in place.  On August 16, the GI consult service saw the patient, and a PEG tube was ordered and scheduled to be placed on August 17; Gary Goldberg provided his consent for this procedure.  Pl. Ex. P.  However, when Dr. Kanzaria, a resident under Nimoityn's supervision, discussed the procedure with the decedent on the morning of August 17, she refused it.  Pl. Ex. Q, R.  The GI team therefore requested a mental

---

[1] PEG stands for Percutaneous Endoscopic Gastrostomy, which involves surgical implantation of a tube through the abdomen into the stomach.

competency evaluation, which was performed by a psychiatry resident that same morning.  Pl. Ex. R, S.

The psychiatry resident concluded that Mrs. Goldberg was not capable of making her own medical decisions.  The resident documented having discussed her findings with the attending physician, but per the hospital's policy, an attending physician from psychiatry saw the patient at 10:00 the next morning and wrote his own note agreeing with the resident's conclusions.  Pl. Ex. S.  Dr. Zhang, another resident under Nimoityn's supervision, then called Gary Goldberg to ask him for documentation evidencing that he possessed power of attorney and was therefore authorized to consent to the procedure on his mother's behalf.  Pl. Ex. V.  Dr. Zhang claims that she left a voicemail, but because Mr. Goldberg did not return the call, the procedure was not performed that day.  Pl. Ex. V.  Once Mr. Goldberg consented, the PEG placement was scheduled for August 19, but the decedent's oxygen saturation levels had dropped to a level at which she could not withstand the sedation required for the procedure.  PL. Ex. X.  At 1:20 p.m. that day, the procedure was cancelled.  Pl. Ex.Y.  By August 20, the decedent's status had worsened to the extent that she was admitted to the Intensive Care Unit.  She was diagnosed with aspiration pneumonia and respiratory failure, and she died on August 24, 2011.

Gary Goldberg now brings this action on behalf of his mother's estate, claiming that Jefferson and Nimoityn were negligent in failing to timely place the PEG tube and provide the decedent with adequate nutrition, resulting in suffering and premature death.

## II.    Controlling Standard

A party moving for summary judgment must identify "each claim or defense—or the part of each claim or defense—on which summary judgment is sought," and the court must grant the motion if the record shows that "there is no genuine dispute as to any material fact and the

movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A fact is material if it "might affect the outcome of the suit under the governing law," and a dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

The party moving for summary judgment has the initial burden of identifying the portions of the record that demonstrate an absence of a genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  The non-moving party must then "rebut the motion with facts in the record and cannot rest solely on assertions made in the pleadings, legal memoranda, or oral argument." *Berckeley Inv. Group. Ltd. v. Colkitt,* 455 F.3d 195, 201 (3d Cir. 2006); *see also Celotex*, 477 U.S. at 324.  While it is not a court's role to make credibility determinations or weigh the evidence, a court must assess "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."  *Liberty Lobby*, 477 U.S. at 251–52.

### III.    Qualifications of Plaintiff's Expert

In 2002, Pennsylvania passed the Medical Care Availability and Reduction of Error Act, commonly known as MCARE.  The statute created a Patient Safety Authority, mandated the keeping of records with respect to medical errors, and established both the substantive standards and procedures for the resolution of medical negligence claims.  The provision at issue here is section 512,[2] which establishes rules for the qualification of expert witnesses:

> **Expert qualifications**
> **(a) General rule.**—No person shall be competent to offer an expert medical
>         opinion in a medical professional liability action against a physician unless
>         that person possesses sufficient education, training, knowledge and
>         experience to provide credible, competent testimony and fulfills the
>         additional qualifications set forth in this section as applicable.

---

[2] Candor requires disclosure that the author of this opinion was involved in negotiating the language of section 512 as an advocate for patient rights under the auspices of the Pennsylvania Association for Justice.

**(b) Medical testimony.**—An expert testifying on a medical matter, including the standard of care, risks and alternatives, causation and the nature and extent of the injury, must meet the following qualifications:

   (1) Possess an unrestricted physician's license to practice medicine in any state or the District of Columbia.

   (2) Be engaged in or retired within the previous five years from active clinical practice or teaching.

Provided, however, the court may waive the requirements of this subsection for an expert on a matter other than the standard of care if the court determines that the expert is otherwise competent to testify about medical or scientific issues by virtue of education, training or experience.

**(c) Standard of care.**—In addition to the requirements set forth in subsections (a) and (b), an expert testifying as to a physician's standard of care also must meet the following qualifications:

   (1) Be substantially familiar with the applicable standard of care for the specific care at issue as of the time of the alleged breach of the standard of care.

   (2) Practice in the same subspecialty as the defendant physician or in a subspecialty which has a substantially similar standard of care for the specific care at issue, except as provided in subsection (d) or (e).

   (3) In the event the defendant physician is certified by an approved board, be board certified by the same or a similar approved board, except as provided in subsection (e).

**(d) Care outside specialty.**—A court may waive the same subspecialty requirement for an expert testifying on the standard of care for the diagnosis or treatment of a condition if the court determines that:

   (1) the expert is trained in the diagnosis or treatment of the condition, as applicable; and

   (2) the defendant physician provided care for that condition and such care was not within the physician's specialty or competence.

**(e) Otherwise adequate training, experience and knowledge.**—A court may waive the same specialty and board certification requirements for an expert testifying as to a standard of care if the court determines that the expert possesses sufficient training, experience and knowledge to provide the testimony as a result of active involvement in or full-time teaching of medicine in the applicable subspecialty or a related field of medicine within the previous five-year time period.

40 Pa. Stat. § 1303.512.

   Defendants contend that Plaintiff's expert, Dr. James Doghramji is not currently board certified, and therefore is not competent to testify. I must determine the status of the witness's

certification.  For many years, Dr. Doghramji was certified by the American Board of Internal

Medicine (ABIM).  In accordance with standard board practice, when his certification was set to

expire he would be required to sit for a Maintenance of Certification (MOC) exam in order to

maintain his credentials.  Recertification requires physicians to pass the MOC exam, as well as

demonstrate knowledge by fulfilling Practice Assessment, Patient Voice, and Patient Safety

requirements.  Plaintiff points out that these latter requirements are generally demonstrated in a

more traditional office or hospital setting, so they are difficult for house call internists like Dr.

Doghramji to fulfill.  For this reason, ABIM began receiving complaints from some physicians

that found the requirements impossible.

    ABIM sent an email on February 3, 2015 responding to these concerns and suspending

the additional requirements for two years.  Pl. Ex. C.  The email assured physicians that more

flexible ways for demonstrating knowledge would be created, and "no internist w[ould] have his

or her certification status changed for not having completed activities in these areas for at least

the next two years."  Pl. Ex. C.  In the meantime, the email instructed it would take time for the

status of affected members to be updated on the ABIM website.  Pl. Ex. C.

    Dr. Doghramji was certified by ABIM for the period of 2004 through 2014.  Pl. Ex. D.

He interpreted this email from ABIM to mean that his board certification would be extended

until 2016.  Pl. Opp'n Mot. Summ. J. at 2.  He later received communications from ABIM

stating that he would be eligible to take the MOC exam in the fall of 2015 or the spring of 2016.

Pl. Ex. A, B.  Therefore, at the time of his December 21, 2015 deposition, Dr. Doghramji

testified that he was presently board certified.  He also testified that he was given an extension by

the ABIM to re-certify.  Defendants counter with evidence that on December 22, 2015, the

ABIM website stated that Dr. Doghramji was not ABIM-certified.  Def. Ex. I.  Plaintiff argues

that it is "unclear" whether that information is reliable, citing the ABIM email that it would take time for each physician's status to be updated after changes to recertification were made.  Pl. Opp'n Mot. Summ. J. at 2.

For purposes of this Motion, because Dr. Doghramji is not listed by the ABIM as currently certified, my analysis of the controlling legal standard will assume that he is not.

Turning to the legal analysis, as a threshold matter, I must determine whether section 512 is applicable in a federal court, where matters of expert qualification are ordinarily determined by Rule 702 of the Federal Rules of Evidence.  I have little difficulty in concluding that if a patient's claim requires expert testimony as to the standard of care,[3] the requirements of section 512 must be met in a federal diversity action.  The point of departure for analyzing this issue is Federal Rule of Evidence 601, which provides that "with respect to an element of a claim or defense as to which state law supplies the rule of decision, the competency of a witness shall be determined in accordance with state law."

Preliminarily, it is important to note that expert testimony plays a defining role in a medical negligence action, because liability depends upon a breach of the standard of care, and the standard of care, in most instances, is defined by a testifying expert physician.  *Maurer v. Trustees of the University of Pennsylvania*, 614 A.2d 754, 757–58 (Pa. Super. Ct. 1992) (collecting cases).  Consequently, the absence of a qualified expert witness can result in dismissal of the case.  *George v. Ellis,* 911 A.2d 121 (Pa. Super. Ct. 2006); *Cimino v. Valley Family Medicine*, 912 A.2d 851 (Pa. Super. Ct. 2006).

---

[3] Not every case of medical malpractice requires expert testimony.  Pennsylvania permits application of the doctrine of *res ipsa loquitor* under appropriate facts.  *Quinby v. Plumsteadville Family Practice. Inc.,* 589 Pa. 183, 907 A.2d 1061 (2006).  Additionally, the plaintiff in a medical malpractice action can prevail without proof of a breach of the standard of care if the plaintiff can establish that a healthcare provider failed to exercise reasonable care.  *Incollingo v. Ewing*, 444 Pa. 263, 282 A.2d 206 (1971).  In practical terms, *Incollingo* represents an application to medical negligence actions of the principles set forth in Judge Hand's famous decision in *The T.J. Hooper*, 60 F.2d 737 (2d Cir. 1932), limiting the power of the medical profession to be the sole arbiter of what constitutes appropriate care.

Section 512 is explicitly couched as a rule of competence.  The Third Circuit has not directly addressed whether state law requirements for experts in malpractice cases fall within Rule 601, but other circuits have, and their analysis is persuasive.  *See Legg v. Chopra,* 286 F.3d 286, 289–92 (6th Cir 2002); *McDowell v. Brown*, 392 F.3d 1283, 1294–97 (11th Cir. 2004); *Liebsack v. United States*, 731 F.3d 850, 856 (9th Cir. 2013). *See also LeMaire By and Through LeMaire v. United States*, 826 F.2d 949, 953 (10th Cir. 1987).  To hold otherwise would ignore the plain terms of the statute.[4]

Defendants argue that because Dr. Doghramji is not presently board-certified, and Dr. Nimoityn is, Doghramji is not competent to testify under section 512.  Structurally, section 512 sets forth a series of requirements for medical experts testifying as to the standard of care, including a requirement of board certification where the defendant is certified.  As set forth above, however, it also creates a safe harbor in subparagraph (e) permitting qualified experts to testify even in the absence of board certification in the defendant's specialty if the court is satisfied that the expert "possesses sufficient training, experience and knowledge" as a result of activity in teaching or the practice of medicine in a related field.

Defendants maintain that although section 512 permits a court to waive board certification in the *same* field as a defendant physician, a testifying expert must nonetheless hold *some* board certification.  In support of this argument, the defense relies upon *Vicari v. Spiegel*, 605 Pa. 381, 989 A.2d 1277 (2010).[5]

---

[4] The same result would follow from traditional principles governing diversity actions established by *Erie Railroad v. Tompkins*, 304 U.S. 64 (1938), because the standard established by section 512 has a substantive, outcome-determinative impact on the case.  In similar contexts, the Third Circuit has applied state law regarding expert qualifications.  *See Chamberlain v. Giampapa,* 210 F.3d 154, 158–61 (3d. Cir. 2000) (applying New Jersey expert certification rule); *In Re Paoli R.R. Yard PCB Litig.,* 53 F.3d 717, 750–52 (3d. Cir. 1994) (applying Pennsylvania rule requiring expert opinion to be rendered to a reasonable degree of medical certainty).

[5] Candor requires disclosure that the author of this opinion successfully argued *Vicari* on behalf of the appellee in the Pennsylvania Supreme Court.

In *Vicari,* the Pennsylvania Supreme Court held that an expert board-certified in oncology was qualified to testify against defendants certified in otolaryngology and radiation oncology respectively.  The Court reviewed the experience and credentials of the plaintiff's expert and found him well-qualified by virtue of training and experience to opine about the treatment options that should have been made available to a cancer patient following surgery.  In reaching this result, the Court made reference to section 512, and in a lengthy paragraph that essentially tracked the language of the statute, concluded that if its requirements are met, "then the court may waive the same specialty and same board certification requirements."  *Id.* at 1281. Defendants here seize upon this language to argue that the Supreme Court has construed section 512 as imposing a requirement that an expert testifying on the standard of care must be board-certified in *some* field.  I disagree.

First, the phrase Defendants deemed controlling is plainly dicta.  The need for board certification in at least one specialty was not before the court because the plaintiff's expert in question was board-certified, but in different specialties than the defendants.  Neither the briefs nor the argument addressed this issue.

Second, and of controlling importance here, the Court's opinion misquoted section 512 in a material way.  Section 512 provides that "a court may waive the same specialty and board certification requirements …."  The language from *Vicari* on which Defendants improperly rely inserts the word "same" a second time in front of "board certification," which fundamentally changes its meaning.  This casual use of language would effectively rewrite the statute in a way that significantly limits the scope of the exception provided by subparagraph (e).  The statute as written explicitly allows a court to waive board certification as a prerequisite to rendering an expert opinion; the purported revision of the statute in *Vicari*'s dicta would not.

In allowing trial judges discretion to accept a physician as competent, the Pennsylvania legislature was cognizant of the fact that any rigid test of qualifications runs the risk of eliminating highly qualified witnesses.  For example, simply as a matter of course, when a specialty board is established, the founding members who create the certifying exam do not sit for it.  The very first specialty board in the United States, the American Board of Ophthalmology, records this phenomenon in its official history, which reflects that of the nine founding directors, none sat for its exam.  *See Our History,* AMERICAN BOARD OF OPTHAMOLOGY, http://advancingexcellenceineyecare.org/our-history/ (last visited June 15, 2016); *Founding Directors,* AMERICAN BOARD OF OPTHAMOLOGY, http://advancingexcellenceineyecare.org/our-history/founding-directors/ (last visited June 15, 2016).  In the field of infectious disease, which began as a subspecialty board of the American Board of Internal Medicine, key founders of the specialty, such as Jay Sanford, never became certified.  E.H. Kass, *History of the Specialty of Infectious Diseases in the United States*, ANNALS OF INTERNAL MED., 106(5): 745–756 (May 1987).  The gap in formal credentials posed by pioneers who help create a specialty but may themselves never complete the certifying process is an ongoing one, as subspecialty boards continue to proliferate.  C.K. Casell and D.B. Reuben, *Specialization, Subspecialization, and Subsubspecialization in Internal Medicine*, NEW ENG. J. MED., 364:12 (March 24, 2011).

Aside from the risk of excluding leading physicians who would rank among the most qualified, the bureaucratic peculiarities of the board certification process themselves demonstrate why section 512 must be applied in accordance with its plain language.  Taking this case as an example, according to the rules of the American Board of Internal Medicine, physicians certified before 1990 are not required to participate in the MOC process to maintain their certification.

*Maintenance of Certification (MOC)*, AMERICAN BOARD OF INTERNAL MEDICINE, http://www.abim.org/maintenance-of-certification/default.aspx (last visited June 15, 2016).  Dr. Doghramji was certified in 1992.  Thus, another physician certified by the very same board just two years earlier would be deemed to have a continuing certification without having completed the MOC requirement (and therefore be qualified to testify) solely by virtue of historical accident.

It also bears mention that the situation in which Dr. Doghramji finds himself is part of a larger controversy within the medical profession about the efficacy and cost-effectiveness of the MOC process.  Physicians have questioned whether the medical practice or outcomes are improved by the process, with peer-reviewed research lending support to that challenge.[6]  At a minimum, it appears that Dr. Doghramji was justified in assuming that his certification remained valid.[7]  The dispute here has more to do with bureaucracy than it has to do with professional competence, which underscores the need for the flexibility of subparagraph (e) as it is written.

In enacting section 512, the Pennsylvania legislature clearly intended to avoid disqualification of experts over technical defects in credentials that do not bear upon a physician's actual expertise.  I am persuaded that the anomalous wording in *Vicari* on which the Defense relies cannot have substantive import, and I therefore hold that an otherwise qualified physician can render an opinion about the standard of care under MCARE even in the absence of board certification.

---

[6] Bradley M. Gray, et al., *Association Between Imposition of a Maintenance of Certification Requirement and Ambulatory Care–Sensitive Hospitalizations and Health Care Costs*, JAMA, 312(22): 2348–57 (2014); John Hayes, et al., *Association Between Physician Time-Unlimited vs. Time-Limited Internal Medicine Board Certification and Ambulatory Patient Care Quality*, JAMA, 312(22): 2358–63 (2014).

[7] Robert Lowes, *ABIM Suspends Controversial MOC Requirements through 2018*, MEDSCAPE MED. NEWS, Dec.16, 2015.

The question then becomes whether Dr. Doghramji is qualified.  First, as noted above, any deficit in his certification is a technical one at best.  More importantly, he has extensive experience in treating elderly patients, including patients in long-term care facilities and patients in hospice, all settings where patient competence and the need for supportive care routinely arise. The Defense is correct that his practice is not hospital-based, but he served on the Medical Executive Committee of both Chestnut Hill Hospital and its affiliated rehabilitation facility, and on the Ethics and Quality Improvement Committees of Chestnut Hill Hospital.  The extent of his expertise in the hospital setting will certainly be an appropriate focus of cross-examination, but he possesses the qualifications to render the opinions set forth in his report.

For these reasons, the global Motion for Summary Judgment will be denied.

## IV.   Jefferson's Direct Liability

Defendant Jefferson moves for summary judgment on all claims of direct corporate liability.  A hospital may be held directly liable for its own "institutional" negligence if it fails in its nondelegable duty to uphold the proper standard of care it owes to a patient.  *Thompson v. Nason Hosp.*, 527 Pa. 330, 339, 591 A.2d 703, 707 (1991).  In contrast to a hospital's potential vicarious liability for its employees' actions, a cause of action for corporate liability "is independent of the negligence of the hospital's employees or ostensible agents" and "arises from the policies, actions or inaction of the institution itself …."  *Moser v. Heistand*, 545 Pa. 554, 560, 681 A.2d 1322, 1326 (1996).  Hospitals' duties are generally divided into four main categories:

> (1) a duty to use reasonable care in the maintenance of safe and adequate facilities and equipment; (2) a duty to select and retain only competent physicians; (3) a duty to oversee all persons who practice medicine within its walls as to patient care; and (4) a duty to formulate, adopt and enforce adequate rules and policies to ensure quality care for the patients.

*Thompson,* 591 A.2d at 707.

12

To establish a breach of institutional duty, a plaintiff must prove that the hospital had actual or constructive knowledge of the defect or procedures which created the harm and that the hospital's negligence was a substantial factor in bringing about the harm. *Id.* at 708. Unless a hospital's negligence is "obvious," a plaintiff must produce expert testimony to establish the breach of duty and "substantial factor" components of such a claim. *Welsh v. Bulger*, 548 Pa. 504, 514, 698 A.2d 581, 585 (1997).

Plaintiff's case has changed materially from the allegations in the Complaint, which asserted that Jefferson negligently hired and/or granted privileges to the Defendant doctors, and that Jefferson conspired with the physicians to intentionally cause the decedent's "early demise." Compl. at Count II, ¶¶ 3–4. Plaintiff has failed to produce evidence in support of those claims and now advances different theories of corporate negligence. Jefferson objects to these newly advanced theories, but there is no need to consider their timeliness because the claims themselves cannot withstand scrutiny.

### A. Alleged Fraudulent Practices by Residents

Plaintiff first argues that Jefferson should be liable for purported fraudulent practices of its residents. Resp. Mot. Summ. J. at 8. Plaintiff seizes upon a single remark made by Dr. Zhang, an internal medicine resident working under Nimoityn. In her deposition, Zhang was asked whether Nimoityn could have taken action based upon the psychiatry resident's entry in the chart that Mrs. Goldberg was not competent as of August 17, a conclusion which the resident documented had been discussed with the attending that same day. Zhang Dep. at 25:20–24. Zhang replied that "when it comes to something like capacity," she would generally wait for the attending psychiatrist to evaluate the patient and write his *own* note, rather than merely relying on the resident's documentation, because she was aware of incidents on other consult services

where a resident had documented discussions with attending physicians that in fact never took place. Zhang Dep. at 26:12–27:2. Plaintiff's expert seizes upon this fragment of testimony to assert that fraud was being committed by residents that the hospital had failed to address, describing the situation as an "egregious" deviation from the standard of care. Doghrmaji Report Supplemental Letter, Def. Ex. E at 10–11.

Plaintiff baldy asserts that the Hospital "clearly had notice of this conduct and at the least had constructive notice." Opp'n Mot. Summ. J. at 8. However, he cites no portions of the record that support this conclusory allegation. There was no attempt to pursue this issue in discovery even to determine whether Zhang's personal impression was well-founded, let alone whether Jefferson was aware of widespread misconduct by residents. Plaintiff does not even attempt to advance some plausible theory as to how the Hospital could be charged with constructive notice. A party opposing a motion for summary judgment may not rely on the unsupported allegations in the Complaint or merely recite the elements of the claim. *Berckeley Inv. Group,* 455 F.3d at 201. One stray remark from a single resident describing her own experiences with residents on other consult services is not sufficient to show that Jefferson should have been on notice of this behavior.

I also note that Plaintiff fails to adequately explain how this fraudulent practice, if proven, would be causally related to the harm alleged. Jefferson's policy was that an attending had 24 hours within which to sign off on a non-emergency consult, which happened in this case. Sign-off was required because residents, in spite of their experience, are still "in training and require the oversight of an attending." Lamsback Report, Def. Ex. at 10. Plaintiff's expert does not opine (nor could he credibly opine) that a requirement for an attending to sign off on a resident's evaluation breaches the standard of care. At deposition, the most Dr. Doghramji

offered was that he had in some instances relied solely upon a resident's note, but this by no means suffices to establish a breach of the standard of care. *Maurer*, 614 A.2d at 762–63 (testimony by expert that he would have treated patient differently than the defendant did not meet standard for imposing liability).

B. *Failure to Evaluate Competency Sooner*

Plaintiff's expert also opines that in light of the decedent's age and lack of competency during prior hospital admissions, the Hospital should have conducted a competency evaluation sooner than it did. The contours of this claim are hazy at best, but based upon the two cases Plaintiff cites and with no further elaboration in the briefing, it appears that Plaintiff is arguing the third duty from *Thompson*: the duty to oversee the care being rendered.

A hospital can be found liable for profound systemic breakdowns where a failure to communicate or transfer responsibility for a patient results in injury. A hospital can also be held liable where there is clear evidence of a worsening condition over a prolonged period of time, where hospital personnel in positions of responsibility must necessarily have been aware of substandard care. Thus, in the first case cited by Plaintiff, *Brodowski v. Ryake,* 855 A.2d 1045 (Pa. Super. Ct. 2005), corporate liability was deemed proper where a patient complaining of numbness and partial paralysis was admitted to a hospital through its emergency room, and because of a series of errors starting at triage and persisting over more than two days, an obvious diagnosis of stroke was missed until it was too late to prevent irreversible damage. In the second case cited by Plaintiff, *Whittington v. Episcopal Hospital,* 768 A.2d 1144 (Pa. Super. Ct. 2001), a high-risk obstetrical patient was seen at a hospital for two late-term prenatal visits where ominous signs were observed, but she was sent home. She then reported as instructed to the hospital for induction at 7:30 one morning, but was kept in a waiting room until 9:00 that night,

during which time she significantly deteriorated.  Even then, delivery was still not accomplished until 11:30 a.m. the following day.  This combination of factors led the Superior Court to conclude that there was sufficient direct involvement on the part of the hospital to support a finding of corporate liability.

The record in this case falls far short of *Brodowski* and *Whittington.*  In both of these cases, patients presented to the hospital in need of urgent attention.  In contrast, issues like patient competence are secondary to the medical condition for which a patient seeks treatment.  A patient's competence can also ebb and flow during a single admission, as Plaintiff's expert conceded during his deposition.  Particularly in the case of a patient with a well-established history with an institution, the notion that hospital supervisory personnel are in a position to monitor the timing of such exams by attending physicians is wholly unrealistic.

*Thompson* is neither a rule of strict liability nor a rule of *respondeat superior.* Pennsylvania law is clear that a party invoking the institutional duty to supervise care must be prepared to establish meaningful notice to the hospital that substandard care threatening patient safety is occurring.  Plaintiff has not met that burden here, and the theories of corporate liability being advanced at this stage appear to be an attempt to salvage some aspect of the claim after Plaintiff abandoned the theories originally pleaded in the Complaint.  Summary judgment will be granted in favor of Jefferson.

## V.    Punitive Damages

The remaining issue is Plaintiff's claim for punitive damages against Nimoityn.  The MCARE Act provides that punitive damages may be awarded against a health care provider "for conduct that is the result of the health care provider's willful or wanton conduct or reckless indifference to the rights of others."  40 P.S. § 1303.505(a).  The Pennsylvania Supreme Court

has established that such a claim "must be supported by evidence sufficient to establish that (1) a defendant had a subjective appreciation of the risk of harm to which the plaintiff was exposed and that (2) he acted, or failed to act, as the case may be, in conscious disregard of that risk." *Hutchison ex rel. Hutchison v. Luddy*, 582 Pa. 114, 124, 870 A.2d 766, 772 (2005) (citation omitted). Mere negligence or even gross negligence is thus insufficient to support a punitive damages award. *See* 40 P.S. § 1303.505(b).

    Plaintiff argues that Nimoityn intentionally ignored signs that his patient was incompetent to make a decision regarding placement of the PEG tube and instead willfully relied on what he believed were the decedent's wishes while disregarding the wishes of the decedent's family. Opp'n Mot. Summ. J. at 9. In support of this claim, Plaintiff argues that Nimoityn's conduct in waiting for the attending psychiatrist to sign off on the resident's competency evaluation and then requiring Power of Attorney documentation before ordering placement of the PEG tube evidence conscious disregard for the well-being of the decedent.

    I disagree. Plaintiff has failed to produce any evidence that Nimoityn's conduct, if wrongful at all, amounts to more than professional negligence. On this record, the most the evidence shows is that Nimoutyn may have been paternalistic in assuming he knew the decedent's wishes better than Mr. Goldberg, but his taking such a stance with respect to his patient falls far short of outrageous. I note that Judge Buckwalter previously allowed the claim to proceed based on an allegation that Defendants "consciously failed to provide her with a feeding tube under the rationale that she was going to die anyway." December 9, 2014 Order at 17–18. That ruling, however, was based in large part on alleged statements made by Dr. Jay Sellers, not Dr. Nimoityn, and made *after* the decedent was transferred from Nimoityn's care.[8]

---

[8] Dr. Sellers has since been dismissed from this case.

Discovery has revealed nothing to support a punitive damages claim against Dr. Nimoityn, and the claim will be dismissed.

_____/s/ Gerald Austin McHugh_
United States District Court Judge